## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

|  |  |
|---|---|
| DAVID HOLLAND, Individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br>     v.<br><br>RITE AID CORPORATION, JOHN T. STANDLEY, DARREN KARST, HEYWARD DONIGAN, and MATTHEW C. SCHROEDER,<br><br>     Defendants. | Case No:<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiff David Holland ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, public filings, wire and press releases published by and regarding Rite Aid Corporation. ("Rite Aid" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### <u>NATURE OF THE ACTION</u>

1.     This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Rite Aid securities between April 26, 2018 and March 13, 2023, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendant's

violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act")

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

5.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff David Holland, as set forth in the accompanying certification, incorporated by reference herein, purchased Rite Aid securities during the Class Period and was economically damaged thereby.

7.      Defendant Rite Aid purports to be a on "the front lines of delivering health care services and retail products to over one million Americans daily. Our pharmacists are uniquely positioned to engage with customers and improve their health outcomes. We provide an array of whole being health products and services for the entire family through over 2,400 retail pharmacy

locations across 17 states. Through Elixir, our pharmacy benefits manager, we provide pharmacy benefits and services to over two million members nationwide."

8.      Rite Aid is incorporated in Delaware and its corporate headquarters are located at 1200 Intrepid Avenue, 2nd Floor, Philadelphia, Pennsylvania 19112. Rite Aid's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "RAD."

9.      Defendant John T. Standley ("Standly") served as the Company's Chief Executive Officer ("CEO") from June 2010 until August 2019. He also formerly served as the Chairman of the Board of Directors (the "Board") from June 2012 until his 2019 departure from the Company.

10.      Defendant Heyward Donigan ("Donigan") served as the Company's CEO from August 2019 until January 2023

11.      Defendant Darren Karst joined the Company as Chief Financial Officer ("CFO") and Executive Vice President in August 2014, and additionally became the Chief Administrative Officer in October 2015. Defendant Karst left Rite Aid in May, 2019.

12.      Defendant Matthew C. Schroeder ("Schroeder") became CFO in March, 2019.

13.      Defendants Standley, Donigan, Karst and Schroeder are collectively referred to herein as the "Individual Defendants."

14.      Each of the Individual Defendants:

    (a)      directly participated in the management of the Company;

    (b)      was directly involved in the day-to-day operations of the Company at the highest levels;

    (c)      was privy to confidential proprietary information concerning the Company and its business and operations;

(d)  was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)  was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)  was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)  approved or ratified these statements in violation of the federal securities laws.

15.  Rite Aid is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

16.  The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

17.  Rite Aid and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading Statements
### Issued During the Class Period

18.  On April 26, 2018, the Company filed with the SEC its Annual Report on Form 10-K for the Year ended March 3, 2018 (the "2017 Annual Report"). Attached to the 2017 Annual Report were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Standley and Karst attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure

of all fraud.

19.     In addition to stating risks related general macroeconomic conditions, a proposed merger with Albertsons, and the Company's high level of indebtedness, the 2018 Annual Report stated the following risks related to the Company's operations:

> **We need to improve our operations in order to improve our financial condition, but our operations will not improve if we cannot effectively implement our business strategy or if our strategy is negatively affected by worsening economic conditions.**
>
> We have not yet achieved the sales productivity level of our major competitors. We believe that improving the sales of existing stores is important to improving profitability and operating cash flow. [ . . .]
>
> **We purchase all of our brand and generic drugs from a single wholesaler. A disruption in this relationship may have a negative effect on us.**
>
> We purchase all of our brand prescription and, with limited exceptions, all of our generic drugs from a single wholesaler, McKesson. [ . . .]
>
> **A significant disruption in our computer systems or a cyber security breach could adversely affect our operations.**
>
> We rely extensively on our computer systems, including those used by EnvisionRx, RediClinic, and Health Dialog, to manage our ordering, pricing, point-of-sale, inventory replenishment and other processes. [ . . .]
>
> **We are subject to payment-related risks that could increase our operating costs, expose us to fraud or theft, subject us to potential liability and potentially disrupt our business.**
>
> We accept payments using a variety of methods, including cash, checks, credit and debit cards, gift cards and mobile payment technology, and we may accept new forms of payment over time. Acceptance of these payment options subjects us to rules, regulations, contractual obligations [ . . .]
>
> **If we fail to protect the security of personal information about our customers and associates, we could be subject to costly government enforcement actions or private litigation.**
>
> Through our sales and marketing activities, we collect and store certain personal information that our customers provide to purchase products or services, enroll in promotional programs, register on our web site, or otherwise communicate and interact with us. [ . . .].

20.     In the 2017 Annual Report, the Company stated that it faced risks inherent to the industry it operated in, including relating to the improper filling of prescriptions. Further, the Company acknowledged that it was subject to various laws, including the False Claims Act. However, the Company did not disclose that it was at higher risk of regulatory action and possible prosecution as a result of systematically and improperly filling unnecessary prescriptions at the time that the 2017 Annual Report was filed.

21.     The 2017 Annual Report stated the following risks related to operating in the Retail Pharmacy and Pharmacy Benefit Management ("PBM") Industries:

***The markets in which we operate are very competitive and further increases in competition could adversely affect us.***

We face intense competition with local, regional and national companies, including other drugstore chains, independently owned drugstores, supermarkets, mass merchandisers, dollar stores and internet pharmacies. [. . .].

***Consolidation in the healthcare industry could adversely affect our business, financial condition and results of operations.***

Many organizations in the healthcare industry, including pharmacy benefit managers, have consolidated to create larger healthcare enterprises with greater market power, which has resulted in greater pricing pressures. [. . .].

***The availability of pharmacy drugs is subject to government regulations.***

The continued conversion of various prescription drugs, including potential conversions of a number of popular medications, to over-the-counter medications may reduce our pharmacy sales and customers may seek to purchase such medications at non-pharmacy stores. Also, if the rate at which new prescription drugs become available slows or if new prescription drugs that are introduced into the market fail to achieve popularity, our pharmacy sales may be adversely affected. The withdrawal of certain drugs from the market or concerns about the safety or effectiveness of certain drugs or negative publicity surrounding certain categories of drugs may also have a negative effect on our pharmacy sales or may cause shifts in our pharmacy or front end product mix.

***Changes in third party reimbursement levels for prescription drugs and changes in industry pricing benchmarks could reduce our margins and have a material adverse effect on our business.***

Sales of prescription drugs reimbursed by third party payors, including the Medicare Part D plans and state sponsored Medicaid and related managed care Medicaid agencies, represented substantially all of our pharmacy sales in our Retail Pharmacy segment in fiscal 2018. [. . .]

***A substantial portion of our pharmacy revenue is currently generated from a limited number of third party payors, and, if there is a loss of, or significant change to prescription drug reimbursement rates by, a major third party payor, our revenue will decrease and our business and prospects could be adversely impacted.***

A substantial portion of our pharmacy revenue is currently generated from a limited number of third party payors. While we are not limited in the number of third party payors with which we can do business and results may vary over time, our top five third party payors accounted for 78.6%, 77.1%, and 76.1% of our pharmacy revenue during fiscal 2018, 2017 and 2016, respectively. [. . .]

***We are subject to governmental regulations, procedures and requirements; our noncompliance or a significant regulatory change could adversely affect our business, the results of our operations or our financial condition.***

*Our business is subject to numerous federal, state and local laws and regulations. Changes in these regulations may require extensive system and operating changes that may be difficult to implement.* ***Untimely compliance or noncompliance with applicable regulations could result in the imposition of civil and criminal penalties that could adversely affect the continued operation of our business, including: (i) suspension of payments from government programs; (ii) loss of required government certifications; (iii) loss of authorizations to participate in or exclusion from government reimbursement programs, such as the Medicare and Medicaid programs; (iv) loss of licenses; or (v) significant fines or monetary penalties****.* The regulations to which we are subject include, but are not limited to, federal, state and local registration and regulation of pharmacies; dispensing and sale of controlled substances and products containing pseudoephedrine; applicable Medicare and Medicaid Regulations; the Health Insurance Portability and Accountability Act or ("HIPAA"); regulations relating to the protection of the environment and health and safety matters, including those governing exposure to and the management and disposal of hazardous substances; ***regulations enforced by the U. S. Federal Trade Commission, the U. S. Department of Health and Human Services and the Drug Enforcement Administration as well as state regulatory authorities, governing the sale, advertisement and promotion of products we sell; anti-kickback laws; false claims laws and federal and state laws governing the practice of the profession of pharmacy.*** We are also governed by federal and state laws of general applicability, including laws regulating matters of wage and hour laws, working conditions, health and safety and equal employment opportunity.

 Additionally, Congress passed the Patient Care Act in 2010, which is resulting in significant structural changes to the health insurance system. Although many of the structural changes enacted by Patient Care Act were implemented in 2014, some of the

applicable regulations and sub-regulatory guidance have not yet been issued and/or finalized (e.g., nondiscrimination in health programs and activities, excise tax on high cost employer sponsored coverage). Significant changes in legislation, regulation and government policy, including, but not limited to, the repeal of all or part of the Patient Care Act could have a material impact on our business. Therefore, we cannot predict what effect, if any, the repeal of all or part of the Patient Care Act or any subsequent replacement legislation may have on our retail pharmacy and pharmacy services businesses.

(Emphasis added).

***Certain risks are inherent in providing pharmacy services; our insurance may not be adequate to cover any claims against us.***

***Pharmacies are exposed to risks inherent in the packaging and distribution of pharmaceuticals and other healthcare products, such as with respect to improper filling of prescriptions, labeling of prescriptions, adequacy of warnings, unintentional distribution of counterfeit drugs and expiration of drugs.*** In addition, federal and state laws that require our pharmacists to offer counseling, without additional charge, to their customers about medication, dosage, delivery systems, common side effects and other information the pharmacists deem significant can impact our business. Our pharmacists may also have a duty to warn customers regarding any potential negative effects of a prescription drug if the warning could reduce or negate these effects. Although we maintain professional liability and errors and omissions liability insurance, from time to time, claims result in the payment of significant amounts, some portions of which are not funded by insurance. We cannot assure you that the coverage limits under our insurance programs will be adequate to protect us against future claims, or that we will be able to maintain this insurance on acceptable terms in the future. Our results of operations, financial condition or cash flows may be adversely affected if in the future our insurance coverage proves to be inadequate or unavailable or there is an increase in liability for which we self-insure or we suffer reputational harm as a result of an error or omission.

(Emphasis added).

***We may be subject to significant liability should the consumption of any of our products cause injury, illness or death.***

Products that we sell could become subject to contamination, product tampering, mislabeling or other damage requiring us to recall our products. In addition, errors in the dispensing and packaging of pharmaceuticals could lead to serious injury or death. Product liability claims may be asserted against us with respect to any of the products or pharmaceuticals we sell and we may be obligated to recall our products. A product liability judgment against us or a product recall could have a material, adverse effect on our business, financial condition or results of operations.

***Risks of declining gross margins in the PBM industry could adversely impact our profitability.***

8

The PBM industry has been experiencing margin pressure as a result of competitive pressures and increased client demands for lower prices, enhanced service offerings and/or better service levels, and higher rebate yields. [. . .].

***The possibility of PBM client loss and/or the failure to win new PBM business could impact our ability to secure new business.***

Our PBM business generates net revenues primarily by contracting with clients to provide prescription drugs and related health care services to plan members. PBM client contracts often have terms of approximately three years in duration, so approximately one third of a PBM's client base typically is subject to renewal each year. [. . .].

***Regulatory or business changes relating to our participation in Medicare Part D, the loss of Medicare Part D eligible members, or our failure to otherwise execute on our strategies related to Medicare Part D, may adversely impact our business and our financial results.***

One of our subsidiaries, Envision Insurance Company ("EIC"), is an insurer domiciled in Ohio (with Ohio as its primary insurance regulator) and licensed in all 50 states, and is approved to function as a Medicare Part D Prescription Drug Plan ("PDP") plan sponsor for purposes of individual insurance products offered to Medicare-eligible beneficiaries and for purposes of making employer/union-only group waiver plans available for eligible clients. We also provide other products and services in support of our clients' Medicare Part D plans or the Federal Retiree Drug Subsidy program. We have made, and may be required to make further, substantial investments in the personnel and technology necessary to administer our Medicare Part D strategy. There are many uncertainties about the financial and regulatory risks of participating in the Medicare Part D program and we can give no assurance that these risks will not materially adversely impact our business and financial results in future periods.

EIC is subject to various contractual and regulatory compliance requirements associated with participating in Medicare Part D. EIC is subject to certain aspects of state laws regulating the business of insurance in all jurisdictions in which EIC offers its PDP plans. As a PDP sponsor, EIC is required to comply with Federal Medicare Part D laws and regulations applicable to PDP sponsors. ***Additionally, the receipt of Federal funds made available through the Part D program by us, our affiliates, or clients is subject to compliance with the Part D regulations and established laws and regulations governing the Federal government's payment for healthcare goods and services, including the Anti-Kickback Statute and the False Claims Act.*** (Emphasis added). Similar to our requirements with other clients, our policies and practices associated with operating our PDP are subject to audit. If material contractual or regulatory non-compliance was to be identified, monetary penalties and/or applicable sanctions, including suspension of enrollment and marketing or debarment from participation in Medicare programs, could be imposed. Further, the adoption or promulgation of new or more complex regulatory requirements associated with Medicare may require us to incur significant compliance-

related costs which could adversely impact our business and our financial results. [. . .]

(Emphasis added).

> ***Failure to timely identify or effectively respond to changing consumer preferences and spending patterns, an inability to expand the products being purchased by our clients and customers, or the failure or inability to obtain or offer particular categories of products could negatively affect our relationship with our clients and customers and the demand for our products and services.***
>
> The success of our business depends in part on customer loyalty, superior customer service and our ability to persuade customers to purchase products in additional categories and our private label brands. [. . .].

22.     On June 1, 2018, the Company filed with the SEC its amended annual report on Form 10-K for the year ended March 3, 2018 (the "Amended 2017 Annual Report"). Attached to the Amended 2017 Annual Report were certifications signed by Defendants Standley and Karst. The certifications signed by Defendants Standley and Karst affirmed that they had reviewed the Amended 2017 Report, and further stated, "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

23.     The Amended 2017 Annual Report was filed to include information on Item 10. Directors, Executive Officers and Corporate Governance; Item 11. Executive Compensation; Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters; Item 13. Certain Related Transactions, and Director Independence; and Item 14. Principal Accountant Fees and Services.

24.     Other than those items, the Company stated that the Amended 2018 Annual Report "continues to speak as of the date of the Original Report and we have not updated the disclosures

contained therein to reflect any events that occurred subsequent to the date of the Original Report."

25.     On April 25, 2019, the Company filed with the SEC its annual report on Form 10-K for the year ended March 2, 2019 (the "2018 Annual Report"). Attached to the 2018 Annual Report were certifications pursuant to SOX signed by Defendants Standley and Schroeder attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

26.     In addition to warnings in relation to general macroeconomic conditions, the Company's high level of indebtedness, and other matters such as the sale of certain Company assets, the 2018 Annual Report stated the following risks related to the Company's operations:

> ***We need to improve our operations in order to improve our financial condition, but our operations will not improve if we cannot effectively implement our business strategy or if our strategy is negatively affected by worsening economic conditions.***
>
> We have not yet achieved the sales productivity level of our major competitors. We believe that improving the sales of existing stores is important to improving profitability and operating cash flow. [. . .].
>
> ***We purchase all of our brand and generic drugs from a single wholesaler. A disruption in this relationship may have a negative effect on us.***
>
> We purchase all of our brand prescription and, with limited exceptions, all of our generic drugs from a single wholesaler, McKesson. [. . .]
>
> ***Failure to manage our chief executive officer transition, failure to attract and retain other qualified employees, increases in wage and benefit costs, changes in laws, and other labor issues could materially adversely affect our financial performance.***
>
> Our success depends to a significant degree on the continued contributions of members of our senior management and other key operations, merchandising and administrative personnel, and the loss of any such persons could have a material effect on our business. [. . .].
>
> ***A significant disruption in our computer systems or a cyber security breach could adversely affect our operations.***

We rely extensively on our computer systems, including those used by EnvisionRx, RediClinic, and Health Dialog, to manage our ordering, pricing, point-of-sale, inventory replenishment and other processes. [. . .].

***We are subject to payment-related risks that could increase our operating costs, expose us to fraud or theft, subject us to potential liability and potentially disrupt our business.***

We accept payments using a variety of methods, including cash, checks, credit and debit cards, gift cards and mobile payment technology, and we may accept new forms of payment over time. [. . .].

***If we fail to protect the security of personal information about our customers and associates, we could be subject to costly government enforcement actions or private litigation.***

Through our sales and marketing activities, we collect and store certain personal information that our customers provide to purchase products or services, enroll in promotional programs, register on our web site, or otherwise communicate and interact with us. [. . .].

27.    In the 2018 Annual Report, the Company stated that it faced risks inherent to the industry it operated in, including risks relating to the improper filling of prescriptions. Further, it acknowledged that it was subject to various laws, including the False Claims Act. However, the Company did not disclose that it was at higher risk of regulatory action and litigation as a result of systematically and improperly filling unnecessary prescriptions at the time that the 2018 Annual Report was filed.

28.    The 2018 Annual Report stated the following risks related to operating in the Retail Pharmacy and PBM Industries:

***The markets in which we operate are very competitive and further increases in competition could adversely affect us.***

We face intense competition with local, regional and national companies, including other drugstore chains, independently owned drugstores, supermarkets, mass merchandisers, dollar stores and internet pharmacies. [. . .].

***Consolidation in the healthcare industry could adversely affect our business, financial condition and results of operations.***

Many organizations in the healthcare industry, including PBMs, have consolidated to create larger healthcare enterprises with greater market power, which has contributed to continued pricing pressures. [. . .].

***The availability of pharmacy drugs is subject to governmental regulations.***

The continued conversion of various prescription drugs, including potential conversions of a number of popular medications, to over-the-counter medications may reduce our pharmacy sales and customers may seek to purchase such medications at non-pharmacy stores. [. . .]

***Changes in third party reimbursement levels for prescription drugs and changes in industry pricing benchmarks could reduce our margins and have a material adverse effect on our business.***

Sales of prescription drugs reimbursed by third party payors, including the Medicare Part D plans and state sponsored Medicaid and related managed care Medicaid agencies, represented substantially all of our pharmacy sales in our Retail Pharmacy segment in fiscal 2019. [. . .].

***A substantial portion of our pharmacy revenue is currently generated from a limited number of third party payors, and, if there is a loss of, or significant change to prescription drug reimbursement rates by, a major third party payor, our revenue will decrease and our business and prospects could be adversely impacted.***

A substantial portion of our pharmacy revenue is currently generated from a limited number of third party payors. While we are not limited in the number of third party payors with which we can do business and results may vary over time, our top five third party payors accounted for 80.4%, 78.6%, and 77.1% of our pharmacy revenue during fiscal 2019, 2018 and 2017, respectively. [. . .]

***We are subject to governmental regulations, procedures and requirements; our noncompliance or a significant regulatory change could adversely affect our business, the results of our operations or our financial condition.***

***Our business is subject to numerous federal, state and local laws and regulations. Changes in these regulations may require extensive system and operating changes that may be difficult to implement. Untimely compliance or noncompliance with applicable regulations could result in the imposition of civil and criminal penalties that could adversely affect the continued operation of our business, including: (i) suspension of payments from government programs; (ii) loss of required government certifications; (iii) loss of authorizations or changes in requirements for participating in, or exclusion from government reimbursement programs, such as the Medicare and Medicaid programs; (iv) loss of licenses; or (v) significant fines or monetary penalties***. (Emphasis added). The regulations to which we are subject include, but are not limited to, federal, state and local registration and regulation of pharmacies; dispensing and sale of controlled

13

substances and products containing pseudoephedrine; applicable Medicare and Medicaid Regulations; the HIPAA; regulations relating to the protection of the environment and health and safety matters, including those governing exposure to and the management and disposal of hazardous substances; *regulations enforced by the U. S. Federal Trade Commission, the U. S. Department of Health and Human Services and the Drug Enforcement Administration as well as state regulatory authorities, governing the sale, advertisement and promotion of products we sell; anti-kickback laws; false claims laws and federal and state laws governing the practice of the profession of pharmacy*. We are also governed by federal and state laws of general applicability, including laws regulating matters of wage and hour laws, working conditions, health and safety and equal employment opportunity.

Additionally, Congress passed the ACA in 2010, which resulted in significant structural changes to the health insurance system. However, in December 2017, the individual mandate was repealed. If the individual mandate repeal or a rollback of other aspects of the ACA, such as Medicaid expansion, actually leads to a significant reduction in demand for the healthcare services, the demand for our pharmacy services businesses may decline and could have a material impact on our business. Therefore, we cannot predict what effect, if any, the repeal of all or part of the ACA or any subsequent replacement legislation may have on our retail pharmacy and pharmacy services businesses.

***Certain risks are inherent in providing pharmacy services; our insurance may not be adequate to cover any claims against us.***

***Pharmacies are exposed to risks inherent in the packaging and distribution of pharmaceuticals and other healthcare products, such as with respect to improper filling of prescriptions, labeling of prescriptions, adequacy of warnings, unintentional distribution of counterfeit drugs and expiration of drugs***. (Emphasis added). In addition, federal and state laws that require our pharmacists to offer counseling, without additional charge, to customers about medication, dosage, delivery systems, common side effects and other information the pharmacists deem significant can impact our business. Our pharmacists may also have a duty to warn customers regarding any potential negative effects of a prescription drug if the warning could reduce or negate these effects. Although we maintain professional liability and errors and omissions liability insurance, from time to time, claims result in the payment of significant amounts, some portions of which are not funded by insurance. We cannot assure you that the coverage limits under our insurance programs will be adequate to protect us against future claims, or that we will be able to maintain this insurance on acceptable terms in the future. Our results of operations, financial condition or cash flows may be adversely affected if in the future our insurance coverage proves to be inadequate or unavailable or there is an increase in liability for which we self-insure or we suffer reputational harm as a result of an error or omission.

***We may be subject to significant liability should the consumption of any of our products cause injury, illness or death.***

Products that we sell could become subject to contamination, product tampering, mislabeling or other damage requiring us to recall our products. In addition, errors in the dispensing and packaging of pharmaceuticals could lead to serious injury or death. Product liability claims may be asserted against us with respect to any of the products or pharmaceuticals we sell and we may be obligated to recall our products. A product liability judgment against us or a product recall could have a material, adverse effect on our business, financial condition or results of operations.

***Risks of declining gross margins in the PBM industry could adversely impact our profitability.***

The PBM industry has been experiencing margin pressure as a result of competitive pressures and increased client demands for lower prices, enhanced service offerings and/or better service levels, and higher rebate yields. [. . .].

***The possibility of PBM client loss and/or the failure to win new PBM business could impact our ability to secure new business.***

Our PBM business generates net revenues primarily by contracting with clients to provide prescription drugs and related health care services to plan members. PBM client contracts often have terms of approximately three years in duration, so approximately one third of a PBM's client base typically is subject to renewal each year. [. . .].

***Regulatory or business changes relating to our participation in Medicare Part D, the loss of Medicare Part D eligible members, or our failure to otherwise execute on our strategies related to Medicare Part D, may adversely impact our business and our financial results.***

One of our subsidiaries, EIC, is an insurer domiciled in Ohio (with Ohio as its primary insurance regulator) and licensed in all 50 states, and is approved to function as a Medicare Part D Prescription Drug Plan ("PDP") plan sponsor for purposes of individual insurance products offered to Medicare-eligible beneficiaries and for purposes of making employer/union-only group waiver plans available for eligible clients. We also provide other products and services in support of our clients' Medicare Part D plans or the Federal Retiree Drug Subsidy program. We have made, and may be required to make further, substantial investments in working capital as well as the personnel and technology necessary to administer our Medicare Part D strategy. There are many uncertainties about the financial and regulatory risks of participating in the Medicare Part D program and we can give no assurance that these risks will not materially adversely impact our business and financial results in future periods.

EIC is subject to various contractual and regulatory compliance requirements associated with participating in Medicare Part D. EIC is subject to certain aspects of state laws regulating the business of insurance in all jurisdictions in which EIC offers its PDP plans. As a PDP sponsor, EIC is required to comply with Federal Medicare Part D laws and regulations applicable to PDP sponsors. ***Additionally, the receipt of Federal funds made***

*available through the Part D program by us, our affiliates, or clients is subject to compliance with the Part D regulations and established laws and regulations governing the Federal government's payment for healthcare goods and services, including the Anti-Kickback Statute and the False Claims Act*. Similar to our requirements with other clients, our policies and practices associated with operating our PDP are subject to audit. *If material contractual or regulatory non-compliance was to be identified, monetary penalties and/or applicable sanctions, including suspension of enrollment and marketing or debarment from participation in Medicare programs, could be imposed*. Further, the adoption or promulgation of new or more complex regulatory requirements associated with Medicare may require us to incur significant costs which could adversely impact our business and our financial results. (Emphasis added). [. . .].

*Failure to timely identify or effectively respond to changing consumer preferences and spending patterns, an inability to expand the products being purchased by our clients and customers, or the failure or inability to obtain or offer particular categories of products could negatively affect our relationship with our clients and customers and the demand for our products and services.*

The success of our business depends in part on customer loyalty, superior customer service and our ability to persuade customers to purchase products in additional categories and our private label brands. [. . .].

29.    On April 27, 2020, the Company filed with the SEC its annual report on Form 10-K for the year ended February 29, 2020 (the "2019 Annual Report"). Attached to the 2019 Annual Report were certifications pursuant to SOX signed by Defendants Donigan and Schroeder attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

30.    In addition to warnings in relation to general macroeconomic conditions, the COVID-19 pandemic, the Company's high level of indebtedness, the 2019 Annual Report stated the following risks related to the Company's operations:

*We need to improve our operations in order to improve our financial condition, but our operations will not improve if we cannot effectively implement our business strategy or if our strategy is negatively affected by worsening economic conditions.*

We have not yet achieved the sales productivity level of our major competitors. [. . .].

*We purchase all of our brand and generic drugs from a single wholesaler. A disruption in this relationship may have a negative effect on us.*

We purchase all of our brand drugs and, with limited exceptions, all of our generic drugs from a single wholesaler, McKesson. [. . .].

***Recent significant changes to our executive leadership team and any future loss of members of such team, and the resulting management transitions could materially adversely affect our financial performance.***

Our success depends to a significant degree on the continued contributions of members of our senior management and other key operations, merchandising and administrative personnel, and the loss of any such persons could have a material effect on our business. [. . .].

***A significant disruption in our computer systems or a cyber security breach could adversely affect our operations.***

We rely extensively on our computer systems, including those used by EnvisionRx, RediClinic, and Health Dialog, to manage our ordering, pricing, point-of-sale, inventory replenishment and other processes. Our systems have been subject to attack [. . .]

***We are subject to payment-related risks that could increase our operating costs, expose us to fraud or theft, subject us to potential liability and potentially disrupt our business.***

We accept payments using a variety of methods, including cash, checks, credit and debit cards, gift cards and mobile payment technology, and we may accept new forms of payment over time. Acceptance of these payment options subjects us to rules, regulations, contractual obligations and compliance requirements including payment network rules and operating guidelines, data security standards and certification requirements, and rules governing electronic funds transfers. [. . .].

***If we fail to protect the security of personal information about our customers and associates, we could be subject to costly government enforcement actions or private litigation.***

Through our sales and marketing activities, we collect and store certain personal information that our customers provide to purchase products or services, enroll in promotional programs, register on our web site, or otherwise communicate and interact with us. We also gather and retain information about our associates in the normal course of business. We may share information about such persons with vendors that assist with certain aspects of our business. Despite instituted safeguards for the protection of such information, security could be compromised and confidential customer or business information misappropriated, for which we have paid related penalties in the past.

31.     In the 2019 Annual Report, the Company stated that it faced risks inherent to the industry it operated in, including as a result of litigation, and also relating to the improper filling of prescriptions. Further, it acknowledged that it was subject to various laws, including the False

Claims Act. However, the Company did not disclose that it was at higher risk of regulatory action,

litigation for having systematically and improperly filled unnecessary prescriptions.

32.     The 2019 Annual Report stated the following risks related to operating in the Retail

Pharmacy and PBM Industries:

**The markets in which we operate are very competitive and further increases in competition could adversely affect us.**

We face intense competition with local, regional and national companies, including other drugstore chains, independently owned drugstores, supermarkets, mass merchandisers, dollar stores and internet pharmacies. Competition from on-line retailers has significantly increased during the past few years. [. . .].

**Consolidation in the healthcare industry could adversely affect our business, financial condition and results of operations.**

Many organizations in the healthcare industry, including PBMs, have consolidated to create larger healthcare enterprises with greater market power, which has contributed to continued pricing pressures. [. . .].

**The availability of pharmacy drugs is subject to governmental regulations.**

The continued conversion of various prescription drugs, including potential conversions of a number of popular medications, to over-the-counter medications may reduce our pharmacy sales and customers may seek to purchase such medications at non-pharmacy stores. [. . .].

**Changes in third party reimbursement levels for prescription drugs and changes in industry pricing benchmarks could reduce our margins and have a material adverse effect on our business.**

Sales of prescription drugs reimbursed by third party payors, including the Medicare Part D plans and state sponsored Medicaid and related managed care Medicaid agencies, represented substantially all of our pharmacy sales in our Retail Pharmacy segment in fiscal 2020.

The continued efforts of the Federal government, health maintenance organizations, managed care organizations, PBM companies, other State and local government entities, and other third-party payors to reduce prescription drug costs and pharmacy reimbursement rates, as well as litigation relating to how drugs are priced, may impact our profitability. [. . .]

**A substantial portion of our pharmacy revenue is currently generated from a limited**

**number of third party payors, and, if there is a loss of, or significant change to prescription drug reimbursement rates by, a major third party payor, our revenue will decrease and our business and prospects could be adversely impacted.**

A substantial portion of our pharmacy revenue is currently generated from a limited number of third party payors. [. . . ].

**A substantial portion of our Pharmacy Services segment revenue is currently generated from a limited number of customers, and, if there is a loss of a major customer, our revenue will decrease and our business and prospects could be adversely impacted.**

A substantial portion of our Pharmacy Services segment revenue is currently generated from a limited number of customers. [. . .].

**We are exposed to risks related to litigation and other proceedings.**

**We operate in a highly regulated and litigious environment. We are involved in legal proceedings, including litigation, arbitration and other claims, and investigations, inspections, audits, claims, inquiries and similar actions by pharmacy, healthcare, tax and other governmental authorities. Legal proceedings, in general, and securities, derivative action and class action and multi-district litigation, in particular, can be expensive and disruptive.** Additionally, defending against these lawsuits and proceedings may involve significant expense and diversion of management's attention and resources. Some of these suits may purport or may be determined to be class actions and/or involve parties seeking large and/or indeterminate amounts, including punitive or exemplary damages, and may remain unresolved for several years. For example, we are a defendant in numerous litigation proceedings relating to opioids.

We cannot predict with certainty the outcomes of these legal proceedings and other contingencies, and the costs incurred in litigation can be substantial, regardless of the outcome. As a result, we could from time to time incur judgments, enter into settlements or revise our expectations regarding the outcome of certain matters, and such developments could harm our reputation and have a material adverse effect on our results of operations in the period in which the amounts are accrued and/or our cash flows in the period in which the amounts are paid.

**We are subject to governmental regulations, procedures and requirements; our noncompliance or a significant regulatory change could adversely affect our business, the results of our operations or our financial condition.**

Our business is subject to numerous federal, state and local laws and regulations. Changes in these regulations may require extensive system and operating changes that may be difficult to implement. **Untimely compliance or noncompliance with applicable regulations could result in the imposition of civil and criminal penalties that could adversely affect the continued operation of our business, including: (i) suspension of payments from government programs; (ii) loss of required government certifications;**

19

*(iii) loss of authorizations or changes in requirements for participating in, or exclusion from consumer reimbursement programs, such as the Medicare and Medicaid programs; (iv) loss of licenses; or (v) significant fines or monetary penalties. The regulations to which we are subject include, but are not limited to, federal, state and local registration and regulation of pharmacies; dispensing and sale of controlled substances and products containing pseudoephedrine; applicable Medicare and Medicaid Regulations; the HIPAA; regulations relating to the protection of the environment and health and safety matters, including those governing exposure to and the management and disposal of hazardous substances; regulations enforced by the U. S. Federal Trade Commission, the U. S. Department of Health and Human Services and the Drug Enforcement Administration as well as state regulatory authorities, governing the sale, advertisement and promotion of products we sell; anti-kickback laws; false claims laws and federal and state laws governing the practice of the profession of pharmacy.* (Emphasis added). We are also governed by federal and state laws of general applicability, including laws regulating matters of wage and hour laws, working conditions, health and safety and equal employment opportunity. [. . .].

***Certain risks are inherent in providing pharmacy services; our insurance may not be adequate to cover any claims against us.***

***Pharmacies are exposed to risks inherent in the packaging and distribution of pharmaceuticals and other healthcare products, such as with respect to improper filling of prescriptions, labeling of prescriptions, adequacy of warnings, unintentional distribution of counterfeit drugs and expiration of drugs.*** (Emphasis added). In addition, federal and state laws that require our pharmacists to offer counseling, without additional charge, to customers about medication, dosage, delivery systems, common side effects and other information the pharmacists deem significant can impact our business. Our pharmacists may also have a duty to warn customers regarding any potential negative effects of a prescription drug if the warning could reduce or negate these effects. Although we maintain professional liability and errors and omissions liability insurance, from time to time, claims result in the payment of significant amounts, some portions of which are not funded by insurance. We cannot assure you that the coverage limits under our insurance programs will be adequate to protect us against future claims, or that we will be able to maintain this insurance on acceptable terms in the future. Our results of operations, financial condition or cash flows may be adversely affected if in the future our insurance coverage proves to be inadequate or unavailable or there is an increase in liability for which we self-insure or we suffer reputational harm as a result of an error or omission.

***We may be subject to significant liability should the consumption of any of our products cause injury, illness or death.***

Products that we sell could become subject to contamination, product tampering, mislabeling or other damage requiring us to recall our products. In addition, errors in the dispensing and packaging of pharmaceuticals could lead to serious injury or death. Product liability claims may be asserted against us with respect to any of the products or pharmaceuticals we sell and we may be obligated to recall our products. A product liability

judgment against us or a product recall could have a material, adverse effect on our business, financial condition or results of operations.

***Risks of declining gross margins in the PBM industry could adversely impact our profitability.***

The PBM industry has been experiencing margin pressure as a result of competitive pressures and increased client demands for lower prices, performance guarantees, enhanced service offerings and higher rebate yields. [. . .].

***The possibility of PBM client loss and/or the failure to win new PBM business could impact our ability to secure new business.***

Our PBM business generates net revenues primarily by contracting with clients to provide prescription drugs and related health care services to plan members. PBM client contracts often have terms of approximately three years in duration, so approximately one third of a PBM's client base typically is subject to renewal each year. [. . .].

***Regulatory or business changes relating to our participation in Medicare Part D, the loss of Medicare Part D eligible members, or our failure to otherwise execute on our strategies related to Medicare Part D, may adversely impact our business and our financial results.***

One of our subsidiaries, EIC, is an insurer domiciled in Ohio (with Ohio as its primary insurance regulator) and licensed in all 50 states, and is approved to function as a Medicare Part D Prescription Drug Plan ("PDP") plan sponsor for purposes of individual insurance products offered to Medicare-eligible beneficiaries and for purposes of making employer/union-only group waiver plans available for eligible clients. We also provide other products and services in support of our clients' Medicare Part D plans or the Federal Retiree Drug Subsidy program. We are working to minimize the working capital tied to the business by reducing and/or selling the receivable as we did for calendar 2019, however there are no assurances that we can reduce or sell the receivable for calendar 2020. ***There are many uncertainties about the financial and regulatory risks of participating in the Medicare Part D program and we can give no assurance that these risks will not materially adversely impact our business and financial results in future periods.***

***EIC is subject to various contractual and regulatory compliance requirements associated with participating in Medicare Part D. EIC is subject to certain aspects of state laws regulating the business of insurance in all jurisdictions in which EIC offers its PDP plans. As a PDP sponsor, EIC is required to comply with Federal Medicare Part D laws and regulations applicable to PDP sponsors. Additionally, the receipt of Federal funds made available through the Part D program by us, our affiliates, or clients is subject to compliance with the Part D regulations and established laws and regulations governing the Federal government's payment for healthcare goods and services, including the Anti-Kickback Statute and the False Claims Act. Similar to our requirements with other clients, our policies and practices associated with operating our PDP are subject to audit.***

*If material contractual or regulatory non-compliance was to be identified, monetary penalties and/or applicable sanctions, including suspension of enrollment and marketing or debarment from participation in Medicare programs, could be imposed.* Further, the adoption or promulgation of new or more complex regulatory requirements associated with Medicare may require us to incur significant costs which could adversely impact our business and our financial results. [. . .]. (Emphasis added).

*Failure to timely identify or effectively respond to changing consumer preferences and spending patterns, an inability to expand the products being purchased by our clients and customers, or the failure or inability to obtain or offer particular categories of products could negatively affect our relationship with our clients and customers and the demand for our products and services.*

The success of our business depends in part on customer loyalty, superior customer service and our ability to persuade customers to purchase products in additional categories and our private label brands. [. . .].

33.    On April 27, 2021, the Company filed with the SEC its annual report on Form 10-K for the year ended February 27, 2021 (the "2020 Annual Report"). Attached to the 2020 Annual Report were certifications pursuant to SOX signed by Defendants Donigan and Schroeder attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

34.    In addition to warnings in relation to general macroeconomic conditions, the COVID-19 pandemic, the Company's high level of indebtedness, the 2020 Annual Report stated the following risks related to the Company's operations:

*We need to improve our operations in order to improve our financial condition, but our operations will not improve if we cannot effectively implement our business strategy or if our strategy is negatively affected by worsening economic conditions.*

We have not achieved the sales productivity level of our major competitors. [. . .].

*We purchase all of our brand and generic drugs from a single wholesaler. A disruption in this relationship may have a negative effect on us.*

We purchase all of our brand drugs and, with limited exceptions, all of our generic drugs from a single wholesaler, McKesson. [. . .]

*Recent significant changes to our executive leadership team and any future loss of*

22

*members of such team, and the resulting management transitions could materially adversely affect our financial performance.*

Our success depends to a significant degree on the continued contributions of members of our senior management and other key operations, merchandising and administrative personnel, and the loss of any such persons could have a material effect on our business. [. . .].

*Our ability to attract and motivate talented employees is uncertain and poses financial risks.*

We regularly compete with similar companies for talented employees and our success depends in part on attracting, retaining, and/or replacing key personnel with equally qualified employees. [. . .]

*Failure or significant disruption to our information technology systems/infrastructure or a cyber-security breach could adversely affect our operations.*

Technology and computer systems are critical to many aspects of our pharmacy business, including, but not limited to, the drug supply chain, our dispensing of drugs, and our reimbursement. [. . . ]

*We are subject to payment- related risks that could increase our operating costs, expose us to fraud or theft, subject us to potential liability and potentially disrupt our business.*

We accept payments using a variety of methods, including cash, checks, credit and debit cards, gift cards and mobile payment technology, and we may accept new forms of payment over time. Acceptance of these payment options subjects us to rules [. . .]

*Any failure to protect the security of personal information about our customers and associates, could result in significant business liability and reputational harm.*
In the ordinary course of business, we collect and store certain personal information that our customers provide to purchase products or services, enroll in promotional programs, register on our web site, or otherwise communicate and interact with us, including in connection with our administration of COVID-19 vaccines. We may collect, maintain, and store information about our associates in the normal course of business and contract with third party business associates and vendors to accomplish these tasks. [. . .].

*Any inability to keep existing store locations or open new locations in desirable places may have a negative impact on our operations.*

We compete with other retailers and businesses to identify and develop desirable locations for retail store operations. Our ability to find suitable locations and our store construction, renovation, and operating costs can vary based on the specific state and locality and applicable zoning, environmental, and real estate laws. [. . .].

*A variety of business continuity hazards and risks could materially and adversely affect our and our vendors' business operations and our quarterly results may fluctuate significantly.*

A variety of potential hazards, risks, and factors could adversely impact our and our vendors' operations and performance, including, but not limited to, health epidemics or pandemics like COVID-19 and the unexpected impact of mitigation efforts, such as social distancing, mask mandates [. . .].

35.     In the 2020 Annual Report, the Company stated that it faced risks inherent to the industry it operated in, including as a result of litigation, and also relating to the improper filling of prescriptions. It also acknowledged that, by that time, it had been named as a defendant in consolidated, opioid-related litigation (In re National Prescription Opiate Litigation (MDL No. 2804)). Further, it acknowledged that it was subject to various laws, including the False Claims Act. However, the Company did not disclose that it was at higher risk of regulatory action and litigation for having systematically and improperly filled unnecessary prescriptions.

36.     The 2020 Annual Report stated the following risks related to operating in the Retail Pharmacy and PBM Industries:

*The markets in which we operate are very competitive and further increases in competition could adversely affect us.*

In the retail pharmacy business, we face intense competition with local, regional and national companies, including other drugstore chains, independently owned drugstores, supermarkets, mass merchandisers, dollar stores and internet pharmacies. [. . .].

*A change in our pharmacy and payor mix could adversely affect our profit margins.*

Our Retail Pharmacy segment is subject to changes in pharmacy and payor mix, including shifts in pharmacy prescription volume toward programs offering less favorable reimbursement terms, which could adversely affect the results of our operations. [. . . ].

*Consolidation in the healthcare industry could adversely affect our business, financial condition and results of operations.*

Many organizations in the healthcare industry, including PBMs, have consolidated to create larger healthcare enterprises with greater market power, which has contributed to

continued pricing pressures. [. . .].

***There are risks related to the availability, pricing, and safety profiles of the pharmacy drugs and products we purchase and sell.***

The continued conversion of various prescription drugs, including potential conversions of a number of popular medications, to over-the-counter medications may reduce our pharmacy sales and customers may seek to purchase such medications at non-pharmacy stores. [. . .].

***Changes in third party reimbursement levels for prescription drugs and changes in industry pricing benchmarks could reduce our margins and have a material adverse effect on our business.***

Sales of prescription drugs reimbursed by third party payors, including the Medicare Part D plans and state sponsored Medicaid and related managed care Medicaid plans, represented substantially all of our pharmacy sales in our Retail Pharmacy segment in fiscal 2021. [. . .]

***A substantial portion of our pharmacy revenue is currently generated from a limited number of third party payors, and, if there is a loss of, or significant change to prescription drug reimbursement rates by, a major third party payor, our revenue will decrease and our business and prospects could be adversely impacted.***

A substantial portion of our pharmacy revenue is currently generated from a limited number of third party payors. [. . .].

***We are exposed to risks related to litigation and other legal proceedings.***

We operate in a highly regulated and litigious environment. ***We and/ or one or more of our subsidiaries are regularly involved in a variety of legal proceedings arising in the ordinary course of our business, including arbitration, litigation (and related settlement discussions), and other claims, and are subject to regulatory proceedings including audits, inspections, inquiries, investigations, and similar actions by health care, insurance, pharmacy, tax and other governmental authorities.*** (Emphasis added). Legal proceedings, in general, and securities, derivative action and class action and multi-district litigation, in particular, can be expensive and disruptive, and may exceed any applicable insurance coverage. Additionally, defending against these lawsuits and proceedings may involve significant expense and diversion of management's attention and resources. Some of these suits may purport or may be determined to be class actions and/or involve parties seeking large and/or indeterminate amounts, including punitive or exemplary damages, and may remain unresolved for several years.

***For example, we, along with certain of our chain pharmacy competitors, have been named as a defendant in numerous lawsuits relating to the distribution and dispensing of prescription opioids, including in the consolidated federal multi-district litigation***

entitled *In re National Prescription Opiate Litigation (MDL No. 2804), currently pending in the United States District Court for the Northern District of Ohio.* (Emphasis added). *Similar cases that name us as a defendant also have been filed in numerous state court proceedings by any array of plaintiffs, including state Attorneys General, counties, cities, municipalities, Native American tribes, hospitals, third-party payors, and individuals. The Company has also received subpoenas, civil investigative demands, and other requests relating to opioid matters from the Department of Justice and several state Attorneys General*.

We cannot predict with certainty the outcomes of these legal proceedings and other contingencies, and the costs incurred in litigation can be substantial, regardless of the outcome. *Proceedings that we believe are insignificant may develop into material proceedings and subject us to unforeseen outcomes or expenses. Additionally, the actions of certain participants in our industry may encourage legal proceedings against us or cause us to reconsider our litigation strategies*. (Emphasis added). As a result, we could from time to time incur judgments, enter into settlements or revise our expectations regarding the outcome of certain matters, and such developments could harm our reputation and have a material adverse effect on our results of operations, financial condition and business practices.

*We are subject to governmental regulations, procedures and requirements; our noncompliance or a significant legislative, regulatory, or public policy change could adversely affect our business, the results of our operations or our financial condition.*

*Our business is subject to numerous federal, state and local laws and regulations. Changes in these laws, regulations, or in related public policy may require extensive system and operating changes that may be difficult to implement. Untimely compliance or noncompliance with applicable regulations could result in the imposition of civil and criminal penalties that could adversely affect the continued operation of our business, including: (i) suspension of payments from government programs; (ii) loss of required government certifications; (iii) loss of authorizations or changes in requirements for participating in, or exclusion from government reimbursement programs, such as the Medicare and Medicaid programs; (iv) loss of licenses; or (v) significant fines or monetary penalties.* The regulations to which we are subject include, but are not limited to, federal, state and local registration and regulation of pharmacies; dispensing and sale of controlled substances and products containing pseudoephedrine, among others; applicable Medicare and Medicaid Regulations; HIPAA; regulations relating to the protection of the environment and health and safety matters, including those governing exposure to and the management and disposal of hazardous substances; regulations enforced by the U.S. Federal Trade Commission, the U.S. Department of Health and Human Services and the Drug Enforcement Administration as well as state regulatory authorities, governing the sale, advertisement and promotion of products we sell; *anti-kickback laws; false claims laws and federal and state laws governing the practice of the profession of pharmacy.* We are also governed by federal and state laws of general applicability, including laws regulating matters of wage and hour laws, working conditions, health and safety and equal employment opportunity.

(Emphasis added).

Our dealings with customers face scrutiny from the federal and state government agencies, including the Federal Trade Commission, who are charged with enforcing consumer protection laws and deterring alleged unfair or deceptive trade practices. Under these laws, regulated entities may be subject to legal action and government investigations in regards to a wide array of customer-facing matters, including product pricing and expiration, disability access, and member loyalty and other financial incentive programs. A failure to keep our customers adequately informed of our practices could result in government investigations or regulatory action which may result in potential fines and penalties. [. . .].

***Government audits, investigations, and reviews could lead to liability and operational changes.***

***Our pharmacy, PBM, and PDP businesses are subject to periodic audits, investigations, and reviews from state and federal regulators and agencies. Health care laws and regulations, particularly within the pharmacy sector, are complex and subject to frequent change. Moreover, federal and state regulators are highly focused on and engage in vigorous enforcement efforts with regard to fraud, waste and abuse within the health care and pharmacy industry***. (Emphasis added). Accordingly, we invest significant resources in our compliance efforts and must constantly re-evaluate our efforts, as the laws, regulations, and enforcement trends may change.

***Because our business is subject to varied audits, investigations, and reviews, we face risks including financial penalties, civil and/or criminal liability, suspension or exclusion from government programs, and possible licensure sanction. For example, because our PDP is governed by CMS' audit authority, it could be subject to financial recoupment, penalties, beneficiary enrollment restrictions, and other forms of sanction.*** In addition, our PBM's operations could be indirectly and adversely impacted if any of its Medicare plan clients are subjected to adverse government audits or enforcement actions. The outcome of any given audit, investigation, and/or review could require significant changes to our business practices, revenue flow, and overall financial condition, with a resulting adverse impact on the Company as a whole. (Emphasis added).

***If our compliance or other systems and processes fail or are deemed inadequate, we may become subject to regulatory actions and/or litigation.***

In addition to Rite Aid being subject to extensive and complex regulations, many contracts that Elixir has with its customers impose compliance obligations on it. These compliance obligations frequently are reviewed and audited by Elixir's customers and regulators. More generally, if the Company's systems and processes designed to maintain compliance with applicable legal and contractual requirements, and to prevent and detect instances of, or the potential for, non-compliance fail or are deemed inadequate, we may be subject to regulatory actions, litigation and other proceedings which may result in damages, fines, suspension or loss of licensure, suspension or exclusion from participation in government

programs and/or other penalties, any of which could adversely affect our businesses, operating results, cash flows and/or financial condition.

***Certain risks are inherent in providing pharmacy services; our insurance may not be adequate to cover any claims against us.***

***Pharmacies are exposed to risks inherent in the packaging and distribution of pharmaceuticals and other healthcare products, such as with respect to improper filling of prescriptions, labeling of prescriptions, adequacy of warnings, unintentional distribution of counterfeit drugs and expiration of drugs***. In addition, federal and state laws that require our pharmacists to offer counseling, without additional charge, to customers about medication, dosage, delivery systems, common side effects and other information the pharmacists deem significant can impact our business. Our pharmacists may also have a duty to warn customers regarding any potential negative effects of a prescription drug if the warning could reduce or negate these effects. Although we maintain professional liability and errors and omissions liability insurance, from time to time, claims result in the payment of significant amounts, some portions of which are not funded by insurance. We cannot assure you that the coverage limits under our insurance programs will be adequate to protect us against future claims, or that we will be able to maintain this insurance on acceptable terms in the future. ***Our results of operations, financial condition or cash flows may be adversely affected if in the future our insurance coverage proves to be inadequate or unavailable or there is an increase in liability for which we self-insure or we suffer reputational harm as a result of an error or omission***. (Emphasis added).

***We may be subject to significant liability should the consumption of any of our products cause injury, illness or death.***

Products that we sell could become subject to contamination, product tampering, mislabeling or other damage requiring us to recall our products. In addition, errors in the dispensing and packaging of pharmaceuticals could lead to serious injury or death. Product liability claims may be asserted against us with respect to any of the products or pharmaceuticals we sell and we may be obligated to recall our products. Moreover, while we have insurance to cover potential product liability and some claims may be subject to indemnification from other parties, we cannot guarantee that our insurance limits and/or indemnification will be adequate to cover any and all product related claims. We also may not be able to maintain this insurance on acceptable terms in the future. A product liability judgment against the Company or a product recall could have a material, adverse effect on our business, reputation, financial condition or results of operations.

***Risks of declining gross margins in the PBM industry could adversely impact our profitability.***

The PBM industry has been experiencing margin pressure as a result of competitive pressures and increased client demands for lower prices, performance guarantees, enhanced service offerings and higher rebate yields. [. . .].

28

***The possibility of PBM client loss and/or the failure to win new PBM business could impact our ability to secure new business.***

Our PBM business generates net revenues primarily by contracting with clients to provide prescription drugs and related health care services to plan members. [. . .].

***Regulatory or business changes relating to our participation in Medicare Part D, the medical loss ratio for our Medicare Part D eligible members, or our failure to otherwise execute on our strategies related to Medicare Part D, may adversely impact our business and our financial results.***

One of our subsidiaries, Elixir Insurance, is an insurer domiciled in Ohio (with Ohio as its primary insurance regulator) and licensed in all 50 states, and is approved to function as a Medicare Part D Prescription Drug Plan ("PDP") plan sponsor for purposes of individual insurance products offered to Medicare-eligible beneficiaries and for purposes of making employer/union-only group waiver plans available for eligible clients. We also provide other products and services in support of our clients' Medicare Part D plans or the Federal Retiree Drug Subsidy program. We are working to minimize the working capital tied to the business by reducing and/or selling the receivable as we did for calendar 2020, however there are no assurances that we can reduce or sell the receivable for calendar 2021. ***There are many uncertainties about the financial and regulatory risks of participating in the Medicare Part D program and we can give no assurance that these risks will not materially adversely impact our business and financial results in future periods.***

***EI is subject to various contractual and regulatory compliance requirements associated with participating in Medicare Part D. EI is subject to certain aspects of state laws regulating the business of insurance in all jurisdictions in which EI offers its PDP plans. As a PDP sponsor, EI is required to comply with Federal Medicare Part D laws and regulations applicable to PDP sponsors. Additionally, the receipt of Federal funds made available through the Part D program by us, our affiliates, or clients is subject to compliance with the Part D regulations and established laws and regulations governing the Federal government's payment for healthcare goods and services, including the Anti-Kickback Statute and the False Claims Act. Similar to our requirements with other clients, our policies and practices associated with operating our PDP are subject to audit. If material contractual or regulatory non-compliance was to be identified, monetary penalties and/or applicable sanctions, including suspension of enrollment and marketing or debarment from participation in Medicare programs, could be imposed.*** Further, the adoption or promulgation of new or more complex Medicare Part D regulatory requirements, including those governing pharmacy networks, benefit designs, and product pricing, could require us to incur significant costs which could adversely impact our business and our financial results. Similar negative impacts could result from potential Part D reimbursement reductions, adverse CMS audits, government enforcement actions, or decreases in star ratings. Further, EI's level of margin is limited by minimum Medical Loss Ratio ("MLR") requirements imposed by the ACA. Medicare PDPs are

subject to minimum MLR audits and EI could be required to pay MLR rebates for failure to meet minimum MLRs in a given year and repeated MLR failures could lead to CMS termination.

In addition, due to the availability of Medicare Part D, some of our employer clients may decide to stop providing pharmacy benefit coverage to retirees, instead allowing the retirees to choose their own Part D plans, which could cause a reduction in demand for our Medicare Part D group insurance products. [. . .]

(Emphasis added).

**Failure to timely identify or effectively respond to changing consumer preferences and spending patterns, an inability to expand the products being purchased by our clients and customers, or the failure or inability to obtain or offer particular categories of products could negatively affect our relationship with our clients and customers and the demand for our products and services.**

The success of our business depends in part on customer loyalty, superior customer service and our ability to persuade customers to purchase products in additional categories and our private label brands. Failure to timely identify or effectively respond to changing consumer preferences and spending patterns, an inability to expand the products being purchased by our clients and customers, or the failure or inability to obtain or offer particular categories of products could negatively affect our relationship with our clients and customers and the demand for our products and services. [. . .]

**The impact of extreme events, natural disasters, and climate change could create unpredictability for our business operations.**

Extreme weather, natural disasters, and pandemics, such as COVID-19, can have severe negative ramifications for the pharmacy industry, including interfering with revenue flows, reimbursement, and the drug supply chain. [. . .].

**The seasonal nature of our business causes fluctuations in operations.**

Our first and fourth fiscal quarter operation results generally fluctuate during the holidays, and cough, cold, and flu season [. . .]

**Changes in laws governing labor, employers, and union organizing may increase our labor costs.**

The Company's business costs are directly impacted by legal and regulatory mandates governing employers and unionizing activities. Federal and state labor laws are subject to ongoing legislative changes, and any new or more stringent mandates imposed on employers, such as minimum wage increases or additional paid leave requirements, will increase our costs as an employer. [. . .].

37.     On April 25, 2022, the Company filed with the SEC its annual report on Form 10-K for the year ended February 26, 2022 (the "2021 Annual Report"). Attached to the 2021 Annual Report were certifications pursuant SOX signed by Defendants Donigan and Schroeder attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

38.     In addition to warnings in relation to general macroeconomic conditions, the COVID-19 pandemic, the Company's high level of indebtedness, the 2021 Annual Report stated the following risks related to the Company's operations:

***We need to improve our operations in order to improve our financial condition, but our operations will not improve if we cannot effectively implement our business strategy or if our strategy is negatively affected by worsening economic conditions.***

We have not achieved the sales productivity level of our major competitors. [. . .]

***We purchase all of our brand and generic drugs from a single wholesaler. A disruption in this relationship may have a negative effect on us.***

We purchase all of our brand drugs and, with limited exceptions, all of our generic drugs from a single wholesaler, McKesson. [. . .]

***Inflation could adversely impact our financial condition and results of operations.***

Inflation in the United States began to rise significantly in the second half of the calendar year of 2021. [. . .]

***Our ability to attract and motivate talented employees is uncertain and poses financial risks.***

We regularly compete with similar companies for talented employees and our success depends in part on attracting, retaining, and/or replacing key personnel with equally qualified employees. [. . .]

***Failure or significant disruption to our information technology systems/infrastructure or a cyber-security breach could adversely affect our operations.***

Technology and computer systems are critical to many aspects of our pharmacy business, including, but not limited to, the drug supply chain, our dispensing of drugs, and our reimbursement. [. . .]

***We are subject to payment-related risks that could increase our operating costs, expose us to fraud or theft, subject us to potential liability and potentially disrupt our business.***

We accept payments using a variety of methods, including cash, checks, credit and debit cards, gift cards and mobile payment technology, and we may accept new forms of payment over time. Acceptance of these payment options subjects us to rules, regulations, contractual obligations and compliance requirements including payment network rules and operating guidelines, data security standards and certification requirements, and rules governing electronic funds transfers. [. . .]

***Any failure to protect the security of personal information about our customers and associates, could result in significant business liability and reputational harm.***

In the ordinary course of business, we collect and store certain personal information that our customers provide to purchase products or services, enroll in promotional programs, register on our web site, or otherwise communicate and interact with us, including in connection with our administration of COVID-19 vaccines. [. . .]

***Any inability to keep existing store locations or open new locations in desirable places may have a negative impact on our operations.***

We compete with other retailers and businesses to identify and develop desirable locations for retail store operations. Our ability to find suitable locations and our store construction, renovation, and operating costs can vary based on the specific state and locality and applicable zoning, environmental, and real estate laws. [. . .]

***A variety of business continuity hazards and risks could materially and adversely affect our and our vendors' business operations and our quarterly results may fluctuate significantly.***
A variety of potential hazards, risks, and factors could adversely impact our and our vendors' operations and performance, including, but not limited to, health epidemics or pandemics like COVID-19, supply chain disruptions and delays, energy shortages and inflationary energy costs, extreme weather, whether as a result of climate change or otherwise, natural disasters, acts of war, terrorism or violence, extended protests or periods of civil unrest, labor disputes, quality control issues, infrastructure failures, trade sanctions, inflation, changing market conditions, the introduction of new prescriptions drugs, the seasonal nature of our business, and changes in payor reimbursement rates and terms. [. . .]

39.    In the 2021 Annual Report, the Company stated that it faced risks inherent to the industry it operated in, including as a result of litigation, and also relating to the improper filling of prescriptions. It also acknowledged that it had been named as a defendant in consolidated,

opioid-related litigation (In re National Prescription Opiate Litigation (MDL No. 2804)). It further

acknowledged that it was subject to various laws, including the False Claims Act. However, the

Company did not disclose that it was at higher risk of regulatory action and litigation for having

systematically and improperly filled unnecessary prescriptions.

40.     The 2021 Annual Report stated the following risks related to operating in the Retail

Pharmacy and PBM Industries:

> **The markets in which we operate are very competitive and further increases in competition could adversely affect us.**
>
> In the retail pharmacy business, we face intense competition with local, regional and national companies, including other drugstore chains, independently owned drugstores, supermarkets, mass merchandisers, dollar stores and internet pharmacies. [. . .].
>
> **New and emerging payment models for health care services reimbursement may hinder our retail pharmacies and PBMs' ability to compete negatively impacting our revenue.**
>
> Government and commercial payors are increasingly exploring alternatives to fee-for-service payment models. Such alternatives include risk sharing, value-based payment and bundled payment systems for health care services. Our retail pharmacies do not operate as part of integrated health care delivery models and, unlike some of our competitors, we have not invested in health care delivery models which integrate different health care services, such as pharmacy and primary care services. [. . .]
> **A change in our pharmacy and payor mix could adversely affect our profit margins.**
>
> Our Retail Pharmacy segment is subject to changes in pharmacy and payor mix, including shifts in pharmacy prescription volume toward programs offering less favorable reimbursement terms, which could adversely affect the results of our operations. [. . .]
>
> **A sudden and material decrease in the number of Medicaid enrollees due to the "Medicaid Cliff" could have a sudden destabilizing impact on retail pharmacy revenue.**
>
> During the COVID-19 related federal public health emergency, the federal government provided supplemental Medicaid funding to states as long as states agreed to provide for continuous Medicaid coverage for current enrollees. When the public health emergency ends, states will once again be required to remove Medicaid ineligible individuals from the Medicaid rolls. [. . .].
>
> **Consolidation in the healthcare industry could adversely affect our business, financial condition and results of operations.**

Many organizations in the healthcare industry, including PBMs and Part D plans, have consolidated to create larger healthcare enterprises with greater market power, which has contributed to continued pricing pressures and has weakened our retail pharmacies' ability to obtain advantageous pharmacy network contracting terms. [. . .]

***There are risks related to the availability, pricing, and safety profiles of the pharmacy drugs and products we purchase and sell.***

The continued conversion of various prescription drugs, including potential conversions of a number of popular medications, to over-the-counter medications may reduce our pharmacy sales and customers may seek to purchase such medications at non-pharmacy stores. [. . .].

***Changes in third party reimbursement levels for prescription drugs and changes in industry pricing benchmarks could reduce our margins and have a material adverse effect on our business.***

Sales of prescription drugs reimbursed by third party payors, including the Medicare Part D plans and state sponsored Medicaid and related managed care Medicaid plans, represented substantially all of our pharmacy sales in our Retail Pharmacy segment in fiscal 2022. The continued efforts of Congress and Federal agencies, health maintenance organizations, managed care organizations, PBM companies, other State and local government entities, and other third-party payors to reduce prescription drug costs and pharmacy reimbursement rates, as well as litigation relating to how drugs are priced, may impact our profitability. [. . .].

***A substantial portion of our pharmacy revenue is currently generated from a limited number of third party payors, and, if there is a loss of, or significant change to prescription drug reimbursement rates by, a major third party payor, our revenue will decrease and our business and prospects could be adversely impacted.***

A substantial portion of our pharmacy revenue is currently generated from a limited number of third party payors. [. . .]

***We are exposed to risks related to litigation and other legal proceedings.***

We operate in a highly regulated and litigious environment. We and/ or one or more of our subsidiaries are regularly involved in a variety of legal proceedings arising in the ordinary course of our business, including arbitration, litigation (and related settlement discussions), and other claims, and are subject to regulatory proceedings including audits, inspections, inquiries, investigations, and similar actions by health care, insurance, pharmacy, tax and other governmental authorities. Legal proceedings, in general, and securities, derivative action and class action and multi-district litigation, in particular, can be expensive and disruptive, and may exceed any applicable insurance coverage. Additionally, defending against these lawsuits and proceedings may involve significant expense and diversion of management's attention and resources. Some of these suits may

purport or may be determined to be class actions and/or involve parties seeking large and/or indeterminate amounts, including punitive or exemplary damages, and may remain unresolved for several years.

For example, we, along with certain of our chain pharmacy competitors, have been named as a defendant in numerous lawsuits relating to the distribution and dispensing of prescription opioids, including in the consolidated federal multi-district litigation entitled In re National Prescription Opiate Litigation (MDL No. 2804), currently pending in the United States District Court for the Northern District of Ohio. Similar cases that name us as a defendant also have been filed in numerous state court proceedings by any array of plaintiffs, including state Attorneys General, counties, cities, municipalities, Native American tribes, hospitals, third-party payors, and individuals. The Company has also received subpoenas, civil investigative demands, and other requests relating to opioid matters from the Department of Justice and several state Attorneys General. *Also, certain "usual and customary" actions are pending (or may be brought) against the Company which seek large and/or indeterminate damages. Generally, these matters allege that the Company's retail stores overcharged for prescription drugs by not submitting the price available to members of the Rite Aid's Rx Savings Program as the pharmacy's usual and customary price, and related theories.  These claims typically are alleged to arise under the Company's agreements with insurers, as tort claims, or under the False Claims Act and similar theories for governmental programs, but may be alleged to arise otherwise.*

*We cannot predict with certainty the outcomes of these legal proceedings and other contingencies, and the costs incurred in litigation can be substantial, regardless of the outcome. Proceedings that we believe are insignificant may develop into material proceedings and subject us to unforeseen outcomes or expenses. Additionally, the actions of certain participants in our industry may encourage legal proceedings against us or cause us to reconsider our litigation strategies. As a result, we could from time to time incur judgments, enter into settlements or revise our expectations regarding the outcome of certain matters, and such developments could harm our reputation and have a material adverse effect on our results of operations, financial condition and business practices.*

(Emphasis added).
'
*We are subject to governmental regulations, procedures and requirements; our noncompliance or a significant legislative, regulatory, or public policy change could adversely affect our business, the results of our operations or our financial condition.*

*Our business is subject to numerous federal, state and local laws and regulations. Changes in these laws, regulations, or in related public policy may require extensive system and operating changes that may be difficult to implement, increase our operating costs and require significant capital expenditures. Untimely compliance or noncompliance with applicable regulations could result in the imposition of civil and criminal penalties that could adversely affect the continued operation of our business,*

*including: (i) suspension of payments from government programs; (ii) loss of required government certifications; (iii) loss of authorizations or changes in requirements for participating in, or exclusion from government reimbursement programs, such as the Medicare and Medicaid programs; (iv) loss of licenses; or (v) significant fines or monetary penalties. The regulations to which we are subject include, but are not limited to, federal, state and local regulation of pharmacies; dispensing and sale of controlled substances and products containing pseudoephedrine, among others; applicable Medicare and Medicaid Regulations; HIPAA; regulations relating to the protection of the environment and health and safety matters, including those governing exposure to and the management and disposal of hazardous substances; regulations enforced by the U.S. Federal Trade Commission, the Consumer Product Safety Commission ("CPSC"), the U.S. Department of Health and Human Services and the DEA as well as state regulatory authorities, governing the sale, advertisement and promotion of products we sell; anti-kickback laws; false claims laws and federal and state laws governing the practice of the profession of pharmacy and medicine. For example, in the U.S., the DEA, FDA and various other regulatory authorities regulate the distribution and dispensing of pharmaceuticals, controlled substances and listed chemicals.* We are required to hold valid DEA and state-level licenses, meet various security and operating standards and comply with the federal and various state controlled substance acts and related regulations governing the sale, dispensing, disposal, holding and distribution of controlled substances and listed chemicals. Regulatory authorities have broad enforcement powers, including the ability to seize or recall products and impose significant criminal, civil and administrative sanctions for violations of these laws and regulations. We are also governed by federal and state laws of general applicability, including laws regulating matters of wage and hour laws, working conditions, health and safety and equal employment opportunity.

Our dealings with customers face scrutiny from the federal and state government agencies, including the Federal Trade Commission, who are charged with enforcing consumer protection laws and deterring alleged unfair or deceptive trade practices. Under these laws, regulated entities may be subject to legal action and government investigations in regards to a wide array of customer-facing matters, including product pricing and expiration, disability access, and member loyalty and other financial incentive programs. A failure to keep our customers adequately informed of our practices could result in government investigations or regulatory action which may result in potential fines and penalties. [. . .]

(Emphasis added).

**Government audits, investigations, and reviews could lead to liability and operational changes.**

*Our pharmacy, PBM, and PDP businesses are subject to periodic audits, investigations, and reviews from state and federal regulators and agencies. Health care laws and regulations, particularly within the pharmacy sector, are complex and subject to frequent change. Moreover, federal and state regulators are highly focused on and engage in vigorous enforcement efforts with regard to fraud, waste and abuse within*

*the health care and pharmacy industry.* Accordingly, we invest significant resources in our compliance efforts and must constantly re-evaluate our efforts, as the laws, regulations, and enforcement trends may change.

***Because our business is subject to varied audits, investigations, and reviews, we face risks including financial penalties, civil and/or criminal liability, suspension or exclusion from government programs, and possible licensure sanction.*** For example, because our PDP is governed by CMS' audit authority, it could be subject to financial recoupment, penalties, beneficiary enrollment restrictions, and other forms of sanction. In addition, our PBM's operations could be indirectly and adversely impacted if any of its Medicare plan clients are subjected to adverse government audits or enforcement actions. The outcome of any given audit, investigation, and/or review could require significant changes to our business practices, revenue flow, and overall financial condition, with a resulting adverse impact on the Company as a whole.

(Emphasis added).

***If our compliance or other systems and processes fail or are deemed inadequate, we may become subject to regulatory actions and/or litigation.***

In addition to Rite Aid being subject to extensive and complex regulations, many contracts that Elixir has with its customers impose compliance obligations on it. These compliance obligations frequently are reviewed and audited by Elixir's customers and regulators. ***More generally, if the Company's systems and processes designed to maintain compliance with applicable legal and contractual requirements, and to prevent and detect instances of, or the potential for, non-compliance fail or are deemed inadequate, we may be subject to regulatory actions, litigation and other proceedings which may result in damages, fines, suspension or loss of licensure, suspension or exclusion from participation in government programs and/or other penalties, any of which could adversely affect our businesses, operating results, cash flows and/or financial condition***.

(Emphasis added).

***Certain risks are inherent in providing pharmacy services; our insurance may not be adequate to cover any claims against us.***

***Pharmacies are exposed to risks inherent in the packaging and distribution of pharmaceuticals and other healthcare products, such as with respect to improper filling of prescriptions, labeling of prescriptions, adequacy of warnings, unintentional distribution of counterfeit drugs and expiration of drugs.*** In addition, federal and state laws that require our pharmacists to offer counseling, without additional charge, to customers about medication, dosage, delivery systems, common side effects and other information the pharmacists deem significant can impact our business. Our pharmacists may also have a duty to warn customers regarding any potential negative effects of a prescription drug if the warning could reduce or negate these effects. Although we maintain professional liability and errors and omissions liability insurance, from time to

37

time, claims result in the payment of significant amounts, some portions of which are not funded by insurance. We cannot assure you that the coverage limits under our insurance programs will be adequate to protect us against future claims, or that we will be able to maintain this insurance on acceptable terms in the future. Our results of operations, financial condition or cash flows may be adversely affected if in the future our insurance coverage proves to be inadequate or unavailable or there is an increase in liability for which we self-insure or we suffer reputational harm as a result of an error or omission.

(Emphasis added).

***We may be subject to significant liability should the consumption of any of our products cause injury, illness or death.***

Products that we sell could become subject to contamination, product tampering, mislabeling or other damage requiring us to recall our products. We could be adversely impacted by the supply of defective or expired products, including the infiltration of counterfeit products into the supply chain, errors in re-labeling of products, product tampering, product recall and contamination or product mishandling issues. In 2021 and early 2022, FDA issued several guidance documents that address various obligations of pharmacy industry stakeholders in complying with the track and trace requirements of the federal Drug Supply Chain Security Act ("DSCSA"), which has the purpose of preventing counterfeit drugs from entering the United States supply chain. These regulatory measures, future FDA DSCSA regulatory measures and the potential for increased FDA DSCSA enforcement could increase pharmacy costs to comply with the DSCSA and pharmacy costs for identifying and investigating potentially counterfeit drugs.

In addition, errors in the dispensing and packaging of pharmaceuticals could lead to serious injury or death. Product liability claims may be asserted against us with respect to any of the products or pharmaceuticals we sell and we may be obligated to recall our products. Moreover, while we have insurance to cover potential product liability and some claims may be subject to indemnification from other parties, we cannot guarantee that our insurance limits and/or indemnification will be adequate to cover any and all product related claims. We also may not be able to maintain this insurance on acceptable terms in the future. A product liability judgment against the Company or a product recall could have a material, adverse effect on our business, reputation, financial condition or results of operations.

***Risks of declining gross margins in the PBM industry could adversely impact our profitability.***

The PBM industry has been experiencing margin pressure as a result of competitive pressures and increased client demands for lower prices, performance guarantees, enhanced service offerings and higher rebate yields. [. . .].

***The possibility of PBM client loss and/or the failure to win new PBM business could impact our ability to secure new business.***

38

Our PBM business generates net revenues primarily by contracting with clients to provide prescription drugs and related health care services to plan members. PBM client contracts often have terms of approximately three years in duration, so approximately one third of a PBM's client base typically is subject to renewal each year. [. . .]

***Regulatory or business changes relating to our participation in Medicare Part D, the medical loss ratio for our Medicare Part D eligible members, or our failure to otherwise execute on our strategies related to Medicare Part D, may adversely impact our business and our financial results.***

One of our subsidiaries, Elixir Insurance (EI), is an insurer domiciled in Ohio (with Ohio as its primary insurance regulator) and licensed in all 50 states, and is approved to function as a Medicare Part D Prescription Drug Plan ("PDP") plan sponsor for purposes of individual insurance products offered to Medicare-eligible beneficiaries and for purposes of making employer/union-only group waiver plans available for eligible clients. [. . .] ***EI is subject to various contractual and regulatory compliance requirements associated with participating in Medicare Part D. EI is subject to certain aspects of state laws regulating the business of insurance in all jurisdictions in which EI offers its PDP plans. As a PDP sponsor, EI is required to comply with Federal Medicare Part D laws and regulations applicable to PDP sponsors. Additionally, the receipt of Federal funds made available through the Part D program by us, our affiliates, or clients is subject to compliance with the Part D regulations and established laws and regulations governing the Federal government's payment for healthcare goods and services, including the Anti-Kickback Statute and the False Claims Act.*** Similar to our requirements with other clients, our policies and practices associated with operating our PDP are subject to audit. ***If material contractual or regulatory non-compliance was to be identified, monetary penalties and/or applicable sanctions, including suspension of enrollment and marketing or debarment from participation in Medicare programs, could be imposed.*** Further, the adoption or promulgation of new or more complex Medicare Part D regulatory requirements, including those governing pharmacy networks, benefit designs, and product pricing, could require us to incur significant costs which could adversely impact our business and our financial results. Similar negative impacts could result from potential Part D reimbursement reductions, adverse CMS audits, government enforcement actions, or decreases in star ratings. Further, EI's level of margin is limited by minimum Medical Loss Ratio ("MLR") requirements imposed by the ACA. Medicare PDPs are subject to minimum MLR audits and EI could be required to pay MLR rebates for failure to meet minimum MLRs in a given year and repeated MLR failures could lead to CMS termination. [. . .]

(Emphasis added).

***Failure to timely identify or effectively respond to changing consumer preferences and spending patterns, an inability to expand the products being purchased by our clients and customers, or the failure or inability to obtain or offer particular categories of***

***products could negatively affect our relationship with our clients and customers and the demand for our products and services.***

The success of our business depends in part on customer loyalty, superior customer service and our ability to persuade customers to purchase products in additional categories and our private label brands. Failure to timely identify or effectively respond to changing consumer preferences and spending patterns, an inability to expand the products being purchased by our clients and customers, or the failure or inability to obtain or offer particular categories of products could negatively affect our relationship with our clients and customers and the demand for our products and services. [. . .]

***The impact of extreme events, natural disasters, and climate change could create unpredictability for our business operations.***

Extreme weather, natural disasters, and pandemics, such as COVID-19, can have severe negative ramifications for the pharmacy industry [. . .]

***The seasonal nature of our business causes fluctuations in operations.***

Our first and fourth fiscal quarter operation results generally fluctuate during the holidays, and cough, cold, and flu season, during which time we typically experience a larger proportion of retail sales and earnings as compared to other fiscal quarters. [. . .].

***Changes in laws governing labor, employers, and union organizing may increase our labor costs.***

The Company's business costs are directly impacted by legal and regulatory mandates governing employers and unionizing activities. Federal and state labor laws are subject to ongoing legislative changes, and any new or more stringent mandates imposed on employers, such as minimum wage increases or additional paid leave requirements, will increase our costs as an employer. [. . .]

41.    The statements contained in ¶¶ 18-40 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Until at least June 2019, Rite Aid filled at least hundreds of thousands of unlawful prescriptions for controlled substances that lacked a legitimate medical purpose, including for potentially lethal opioids such as oxycodone and fentanyl; (2) Rite Aid pharmacists filled these prescriptions despite clear "red flags" that indicated that the prescriptions were unlawful; (3) Rite Aid ignored evidence that its stores were dispensing unlawful prescriptions, and

intentionally deleted internal notes about suspicious prescribers written by concerned pharmacists; (4) by knowingly filling unlawful prescriptions for controlled substances, Rite Aid violated the Controlled Substances Act and, where Rite Aid sought reimbursement from federal healthcare programs, also violated the False Claims Act; (5) as a result, it was at risk of prosecution by federal authorities such as the United States Department of Justice ("DOJ") and (6) as a result, Defendants' statements about its business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all times.

### THE TRUTH BEGINS TO EMERGE

42.     On Monday, March 13, 2023, after market hours, the DOJ announced in a press release that it had filed a lawsuit against Rite Aid, thus intervening in a whistleblower lawsuit brought under the False Claims Act (FCA) against Rite Aid and various subsidiaries, alleging that Rite Aid knowingly filled unlawful prescriptions for controlled substances. The DOJ also announced that it was suing Rite Aid for violations of the Controlled Substances Act (CSA). The DOJ Press Release stated, in pertinent part:

> The Justice Department announced today that the United States has filed a complaint in intervention in a whistleblower lawsuit brought under the False Claims Act (FCA) against Rite Aid Corporation and various subsidiaries (collectively Rite Aid) alleging that Rite Aid knowingly filled unlawful prescriptions for controlled substances. In addition to alleging claims under the FCA, the government's complaint also alleges violations of the Controlled Substances Act (CSA). Rite Aid is one of the country's largest pharmacy chains, with over 2,200 pharmacies in 17 states.
>
> **"The Justice Department is using every tool at our disposal to confront the opioid epidemic that is killing Americans and shattering communities across the country," said Attorney General Merrick B. Garland. "That includes holding corporations, like Rite Aid, accountable for knowingly filling unlawful prescriptions for controlled substances."**
>
> **"We allege that Rite Aid filled hundreds of thousands of prescriptions that did not meet legal requirements," said Associate Attorney General Vanita Gupta. "According to our complaint, Rite Aid's pharmacists repeatedly filled prescriptions for controlled substances with obvious red flags, and Rite Aid intentionally deleted internal notes about suspicious prescribers. These practices opened the floodgates for millions of opioid pills and other controlled substances to flow illegally out of Rite Aid's stores."**

"The opioid crisis has exacted a heavy toll on communities across the United States," said Principal Deputy Assistant Attorney General Brian M. Boynton, head of the Justice Department's Civil Division. "Today's complaint is an important reminder that the Justice Department will hold accountable any individuals or entities, including pharmacies, that fueled this terrible crisis."

*"Pharmacies, physicians, corporations, and other health care entities that have contributed to the proliferation of opioids in our communities and the tragic loss of life from overdose deaths must answer for their role in the crisis we now face,"* said First Assistant U.S. Attorney Michelle M. Baeppler for the Northern District of Ohio. "This complaint is a continuation of the Justice Department's commitment to hold accountable those entities that aggravated and profited from the opioid crisis."

*The government's complaint alleges that, from May 2014 through June 2019, Rite Aid knowingly filled at least hundreds of thousands of unlawful prescriptions for controlled substances that lacked a legitimate medical purpose, were not for a medically accepted indication, or were not issued in the usual course of professional practice. These unlawful prescriptions included, for example, prescriptions for the dangerous and highly abused combination of drugs known as "the trinity," prescriptions for excessive quantities of opioids, such as oxycodone and fentanyl, and prescriptions issued by prescribers whom Rite Aid pharmacists had repeatedly identified internally as writing illegitimate prescriptions.*

*The government alleges that Rite Aid pharmacists filled these prescriptions despite clear "red flags" that were highly indicative that the prescriptions were unlawful. The government further alleges that Rite Aid not only ignored substantial evidence from multiple sources that its stores were dispensing unlawful prescriptions, including from certain pharmacists, its distributor, and its own internal data, but compounded its failure to act by intentionally deleting internal notes about suspicious prescribers written by Rite Aid pharmacists and directing district managers to tell pharmacists "to be mindful of everything that is put in writing."* By knowingly filling unlawful prescriptions for controlled substances, the government alleges that Rite Aid violated the CSA and, where Rite Aid sought reimbursement from federal healthcare programs, also violated the FCA.

Along with Rite Aid Corporation, the government's complaint names as defendants the following Rite Aid subsidiaries: Rite Aid Hdqtrs, Corp.; Rite Aid of Connecticut, Inc.; Rite Aid of Delaware, Inc.; Rite Aid of Maryland; Rite Aid of Michigan; Rite Aid of New Hampshire; Rite Aid of New Jersey; Rite Aid of Ohio; Rite Aid of Pennsylvania; and Rite Aid of Virginia.

(Emphasis added).

43.     On this news, Rite Aid's stock fell $0.62 per share on March 14, 2023, or 18.9%, on unusually heavy trading volume, to close at $2.66, damaging investors. On March 15, 2023, Rite Aid's stock fell as much as $0.235, or 8.8%, before closing at $2.57, a 3.8% decline from the prior day's close.

44.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and the other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

45.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired Rite Aid securities publicly traded on the NYSE during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

46.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

47.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

48.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

49.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

50.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and

burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

51.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- the Company's securities met the requirements for listing, and were listed and actively traded on the NYSE, an efficient market;

- as a public issuer, the Company filed public reports;

- the Company communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period; and

- the Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

52.     Based on the foregoing, the market for the Company securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the common units, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

53.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I
### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder
### Against All Defendants

54.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

55.     This Count asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

56.      During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

57.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

58.     Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

59.     Individual Defendants, who are or were senior executives and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Company's personnel to members of the investing public, including Plaintiff and the Class.

60.     As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

61.     Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

62.      As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

63.     By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of the Company's securities during the Class Period.

**COUNT II**
**Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

64.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

65.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's misstatement of revenue and profit and false financial statements.

66.     As officers of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition

and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

67.     Because of their positions of control and authority as senior executives and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Company securities.

68.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)     declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b)     awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)     awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)      awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: March 20, 2023

**KARON LLC**
/s/*Daniel R. Karon*
Daniel Karon (#0069304)
700 W. St. Clair Ave., Ste. 200,
Cleveland, Ohio 44113
Telephone: (216) 622-1851
Email: dkaron@karonllc.com

*Liaison Counsel for Plaintiffs and the Class*

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*